IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ATTILA KNOTT

    v.               :  Civil Action No. DKC 13-2486

RUTH WEDGWOOD

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this legal malpractice case is Defendant's motion to dismiss. (ECF No. 55). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Defendant's motion will be granted in part and denied in part.

**I.   Background**

The factual allegations and procedural history have been explained in prior opinions, but will be repeated here for clarity purposes. (*See* ECF Nos. 58 & 67).

    **A.   Factual Background**

In May 2002, Plaintiff Attila Knott, a resident of Budapest, Hungary, was indicted by a grand jury in the United States District Court for the District of Connecticut on various counts of mail, wire, and bank fraud. (ECF No. 1 ¶ 8). At some point after his indictment, Plaintiff fled to Hungary and the Government sought to extradite him from Hungary. (*See* ECF No.

55-2, at 38); *Philips v. Pitt County Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (the court "may properly take judicial notice of matters of public record" on a motion to dismiss).  According to the Government, "[t]he Hungarians will not extradite a Hungarian national who has residence in Hungry.  The FBI filed what's called a Red Notice with Interpol which announces that he is wanted, a federal fugitive."  (ECF No. 55-2, at 38). Plaintiff subsequently traveled to Germany in October 2008, where he was arrested. (*Id.*).  Thus, Plaintiff's incarceration began in Dresden, Germany in October 2008.  Then, between November and December 2008, Plaintiff's "German criminal attorney Endrik Wilhelm" recommended to Mr. Knott the legal services of attorney Ruth Wedgwood – Defendant in this case. Plaintiff asserts that Endrik Wilhelm "recommended [Ms. Wedgwood's] services as a legal expert in international criminal law to represent [] [P]laintiff in Germany and the United States, pending his extradition to the United States to face criminal charges." (ECF No. 1 ¶ 9).  Plaintiff represents that he never executed a retainer with Ms. Wedgwood, however, and never gave her "verbal authority to act as his attorney." (*Id.* ¶ 15).  Yet Ms. Wedgwood allegedly charged Plaintiff for: time spent on legal research; meetings with Plaintiff in Germany and the United States; and calls with his attorney in Germany.

Plaintiff also alleges that Ms. Wedgwood billed him for time spent dining with Endrik Wilhelm. (*Id.* ¶¶ 17-37)

Plaintiff was extradited to the United States in April of 2009, where he was confined at the Wyatt Detention Center in Rhode Island. (*Id.* ¶ 26). Plaintiff asserts that "[w]hen the [D]efendant came to the Wyatt Detention Center in Rhode Island to meet with [] [P]laintiff[,] he advised her that he did not wish her to serve as his attorney" and he retained Robert Mann as his new attorney to represent him in plea negotiations, hearings, and through trial. (*Id.* ¶¶ 26-27). On June 29, 2009, Plaintiff pled guilty to bank fraud and mail fraud, and the Government dismissed the remaining counts of the indictment. (*See* ECF No. 55-3). On November 20, 2009, Judge Christopher Droney[1] sentenced Plaintiff to the period of time already served (nine months total) and ordered that Plaintiff pay a fine in the amount of $10,000. (ECF No. 55-4, at 20).[2]

### B.    Procedural Background

On March 31, 2011, Plaintiff filed a complaint against Ruth Wedgwood in the United States District Court for the District of Connecticut, alleging that she charged him for legal services before they executed a retainer agreement, and that "due to

---

[1] In 2011, Judge Droney was elevated to the United States Court of Appeals for the Second Circuit.

[2] Judge Droney noted that Plaintiff already paid all of the restitution. (*See* ECF No. 55-4, at 19).

defendant's professional negligence and misfeasance while acting as plaintiff's counsel, the plaintiff was cause[d] to serve an additional 8 months in prison and deprived of his freedom, liberty and civil rights." (ECF No. 1 ¶ 39). This case was transferred to this court on August 28, 2013 upon the parties' joint request.[3]

Prior to transfer, Plaintiff was represented by Stephen Krawitz and Stephen C. Greenspan in Connecticut. No appearance was entered on behalf of Plaintiff following transfer to this court; thus, the undersigned issued an order to show cause as to why this case should not be dismissed. (ECF No. 48). The order to show cause required a response no later than February 14, 2014. Stephen Krawitz then moved for an extension of time until February 28, 2014 to apply for admission *pro hac vice* and enter his appearance in the case. (*See* ECF Nos. 51 & 53). The court held a telephone conference with the parties on March 7, 2014 (ECF No. 54). Shortly thereafter, Defendant moved to dismiss on March 19, 2014. (ECF No. 55). A few days later, on March 21, 2014, Maury Epner entered his appearance as "co-counsel for the Plaintiff." (ECF No. 56). By that point, Mr. Krawitz still had not moved for admission *pro hac vice*, however, despite

---

[3] Defendant initially moved to dismiss the complaint in the District of Connecticut. The court issued an electronic order on January 31, 2012 denying without prejudice Defendant's motion to dismiss in light of the parties' pursuit of mediation. (ECF No. 26).

representations to the court that he would do so by March 14, 2014. (ECF No. 53). Plaintiff was required to file an opposition to Defendant's motion to dismiss by April 7, 2014, but failed to do so.

On April 17, 2014, the undersigned issued a memorandum opinion and order dismissing this case. (ECF Nos. 58 & 59). On the same date, Maury Epner – Plaintiff's local counsel – filed correspondence to suggest that extenuating circumstances prevented Mr. Krawitz from filing an opposition and that he intended to move for an extension of time to file an opposition, but the memorandum opinion preempted that effort. (ECF No. 60). Subsequently, Plaintiff filed a motion for reconsideration on April 23, 2014 (ECF No. 62),[4] which was granted on September 11, 2014 by memorandum opinion and order. (ECF Nos. 68 & 69). Plaintiff subsequently filed an opposition (ECF No. 69), and Defendant replied (ECF No. 70).

## II.  Standard of Review

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). A plaintiff's complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim

---

[4] On May 19, 2014, Mr. Krawitz finally moved for admission *pro hac vice*, which was granted. (ECF Nos. 64 & 66).

showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

At this stage, all well-pleaded allegations in a complaint must be considered as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and all factual allegations must be construed in the light most favorable to the plaintiff, *see Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (*citing Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). In evaluating the complaint, unsupported legal allegations need not be accepted. *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). Legal conclusions couched as factual allegations are insufficient, *Iqbal*, 556 U.S. at 678, as are conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged,

6

but it has not 'show[n] . . . that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (*quoting* Fed.R.Civ.P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

The recent analysis undertaken by the United States Court of Appeals for the Fourth Circuit in explaining the standard of review on a motion to dismiss in the context of a Title VII claim is instructive:

> Federal Rule of Civil Procedure 8(a)(2) "requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal quotation marks and citation omitted). But this rule for pleading "requires more than labels and conclusion, and a formulaic recitation of the elements of a cause of action will not do." *Id.* Instead, a complaint must contain "[f]actual allegations [sufficient] to raise a right to relief above the speculative level." *Id.; see also Iqbal*, 556 U.S. at 678 (holding that a complaint "tender[ing] 'naked assertion[s]' devoid of 'further factual enhancement'" does not "suffice" (*quoting Twombly*, 550 U.S. at 557)). The Supreme Court has accordingly held that Rule 8(a)(2) requires that "a complaint . . . contain[] sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face'" in the sense that the complaint's factual allegations must allow a "court to draw the reasonable

> inference that the defendant is liable for
> misconduct alleged." *Iqbal*, 556 U.S. at 678
> (emphasis added).

*McCleary-Evans v. Maryland Dept. of Transp., State Highway
Admin.*, ---F.3d----, 2015 WL 1088931, at *3 (4th Cir. 2015).

## III. Analysis

The complaint contains somewhat conflicting allegations.
On the one hand, Plaintiff contends that at no point either in
Germany or in the United States did Ms. Wedgwood produce a
retainer agreement or contract for legal services, and that when
she finally produced a contract for Plaintiff's signature when
she visited him in Rhode Island, "it was not signed by
[P]laintiff and [D]efendant was discharged." (ECF No. 1 ¶ 14).
On the other hand, Plaintiff takes the position that Ms.
Wedgwood acted as his attorney until April 2009, (*id.* ¶ 40), at
which point Plaintiff retained new counsel, and that "due to
[Ms. Wedgwood's] professional negligence and misfeasance while
acting as [P]laintiff's counsel, [] [P]laintiff was cause[d] to
serve an additional 8 months in prison and deprived of his
freedom, liberty and civil rights." (*Id.* ¶ 39). Putting aside
these inconsistencies and assuming Ms. Wedgwood indeed
represented Mr. Knott in connection with his criminal
prosecution, as explained below, the legal malpractice claim is
problematic in other respects.

## A.   Legal Malpractice

Neither party has identified which law applies to the legal malpractice claim. When choosing the applicable substantive law while exercising diversity jurisdiction, as here, a federal district court applies the choice of law rules of the forum state. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). Regarding tort claims, such as the claim of legal malpractice, Maryland applies the law of the state where the alleged harm occurred ("*lex loci delicti*"). *See, e.g., Proctor v. Washington Metropolitan Area Transit Auth.*, 412 Md. 691, 726 (2010). Here, it is not at all clear which state or country's law applies. Nevertheless, choice-of-law analysis becomes necessary "only if the relevant laws of the different states lead to different outcomes." *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F.Supp.2d 737, 750 (D.Md. 2003). Where the laws "do not so conflict, the choice is immaterial, and the law of the forum-Maryland-governs." *Id.; see also Cleaning Auth., Inc. v. Nubert*, 739 F.Supp.2d 807, 820 (D.Md. 2010). Here, neither party has identified conflicting state or foreign laws. Indeed, neither party specifically cites *any* state or foreign law pertaining to the legal malpractice claim, instead focusing on whether the allegations rise above the speculative level under *Iqbal*. Accordingly, the court will apply the law of the forum state, Maryland.

Under Maryland law, in order to maintain a cause of action for legal malpractice, "a plaintiff must allege: (1) the attorney's employment; (2) his neglect of a reasonable duty; and (3) loss to the client proximately caused by that neglect of duty." *Roginsky v. Blake*, 131 F.Supp.2d 715, 719-20 (D.Md. 2000); *Dow v. Jones*, 311 F.Supp.2d 461, 466 (D.Md. 2004). Plaintiff essentially argues ineffective assistance of counsel by Ms. Wedgwood, contending that had Ms. Wedgwood "properly and diligently acted [o]n [P]laintiff's behalf, and in his best interest, he would have avoided 8 months of unnecessary incarceration." (*Id.* ¶ 44). The complaint asserts that although Ms. Wedgwood spoke several times with the Government attorney prosecuting Mr. Knott's case, "she made no attempt to determine what would happen if [P]laintiff agreed to immediately pay back the funds he was charged with taking without any condition, stop fighting extradition and return to the United States voluntarily." (ECF No. 1 ¶ 33). Along the same lines, in the opposition to the motion to dismiss, Plaintiff asserts that "[h]ad [Ms.] Wedgwood competently assisted Knott, she could have secured a plea deal for him that would have resulted not only in less total time in prison, but in less time enduring the harsh conditions in the eastern German prison, than he ended up having to serve by contesting extradition." (ECF No. 69, at 3). Notably, the Court of Special Appeals of Maryland has held that

a plaintiff claiming "criminal malpractice," or legal malpractice arising from a criminal prosecution, must additionally allege: "(4) the criminal plaintiff's initiation of post conviction, appellate, or habeas relief premised on the lawyer's error; (5) and, ultimately, the criminal plaintiff's successful pursuit of post conviction, appellate, or habeas relief based on attorney error." *Berringer v. Steele*, 133 Md.App. 442, 497 (2000); *see also Harrigan v. Rolle*, Civ. Action No. ELH-14-00199, 2014 WL 7146970, at *11 (D.Md. Dec. 12, 2014) ("As noted, it is undisputed that Harrigan has failed to obtain post-conviction relief.  And, in Pennsylvania, as in Maryland, such relief is a predicate to recovery [with] respect to a claim for criminal legal malpractice.  Therefore, Counts One through Four fail as a matter of law.").  This point need not be addressed, however, as explained below.

As Defendant argues, the legal malpractice claim is entirely speculative as it relies on the contention that had Ms. Wedgwood recommended to Plaintiff not to fight extradition in Germany, he would have been released to the United States and Judge Droney nonetheless would have sentenced him to time served (which by Plaintiff's own arguments would result in total incarceration of approximately one month for bank fraud). Notably, Judge Droney offered the following rationale for sentencing Mr. Knott to time served:

> I have decided to impose a non-guidelines
> sentence for the following reasons:
>
> There is no question that this was a
> well planned and well executed scheme to
> defraud a number of banks and a financing
> company, as the Government has stated in its
> sentencing memo.   Mr. Knoth[5] intentionally
> and surreptitiously removed the valuable
> equipment, supplies and fixtures and fled to
> Hungary.   The amount stolen is also very
> significant, over $500,000.   There is no
> justification for such conduct, not even the
> economic and family pressures Mr. Knoth has
> indicated and felt at that time.
>
> The principal reasons, though, that a
> non-guidelines sentence is appropriate here
> *are the amount of time Mr. Knoth has already*
> *been imprisoned, as well as the conditions*
> *of his imprisonment, his full payment of*
> *restitution to his victims, his significant*
> *mental health issues, his recent efforts at*
> *charitable services and his family*
> *circumstances.   Mr. Knoth has already served*
> *nine months in prison, including five months*
> *in particularly difficult conditions in*
> *Germany.*   It is likely he would not receive
> sentence credit for this time in Germany
> and, thus, would materially increase any
> Guidelines incarceration sentence that I
> would impose.

(ECF No. 55-4, at 18-19) (emphasis added). Plaintiff's belief

that he would have avoided eight months of incarceration had Ms.

Wedgwood advised him not to fight extradition is entirely

speculative and does not cross the line of plausibility.   As

indicated above, Judge Droney based his decision to impose a

---

[5] Defendant asserts that "[a]t some point, Plaintiff appears
to have changed the spelling of his surname from 'Knoth' to
'Knott.' . . .   It does not appear to have been legally executed
in the United States." (ECF No. 55-1, at 2 n.2).

sentence of time served at least partially because Mr. Knott already had served nine months in prison, five of which were "in particularly difficult conditions in Germany." Moreover, even assuming Plaintiff had not fought extradition, promptly returned to the United States, and Ms. Wedgwood somehow could have convinced the Government to recommend that Plaintiff receive a sentence of time served under those circumstances, ultimately, it was up to Judge Droney to determine the appropriate sentence, regardless of what the Government or defense counsel would have recommended and regardless of the terms of any plea agreement. Defendant correctly argues that "Plaintiff cannot possibly carry his burden of proving that, had he returned to the United States promptly after his arrest, rather than fighting his extradition from Germany, he would still have been sentenced to time served, and would therefore have spent eight fewer months behind bars. The discretionary nature of the Sentencing Guidelines simply underscores the impossibility of Plaintiff[] being able to succeed in supporting his speculation with actual facts." (ECF No. 55-1, at 11-12). Although Plaintiff need not come forward with proof at the motion to dismiss stage, taking all the allegations as true in the complaint, none of them rise above the speculative level and are belied by matters of public record, including the sentencing transcript from his criminal case.

In his opposition to Defendant's motion to dismiss, Plaintiff asserts that his legal malpractice claim also is premised on the allegation that Ms. Wedgwood "incompetently caused Knott to serve more time in the harsher environment of a German prison than he otherwise would have served." (ECF No. 69, at 3). The argument goes:

> Had [Mr. Knott] enjoyed the assistance of competent counsel, the evidence will show that he could have waived extradition and returned to the United States to face his charges far sooner than he did. Establishing this does not require – as Wedgwood claims the remainder of Knott's malpractice claim requires – reading the mind of a sentencing judge; it requires no more than brief expert testimony explaining the extradition process, coupled with testimony of what Wedgwood did counsel and what Mann would have counseled had he been given the opportunity.

(*Id.* at 4).

The allegation that Ms. Wedgwood committed legal malpractice because had Plaintiff not fought extradition he would have avoided five months in a German prison under harsher conditions than he would have faced in the United States is not found anywhere in the complaint. Defendant argues, "[t]here is no theory of legal malpractice under which a party may claim that his lawyer violated professional standards by allowing him to serve his sentence in one prison rather than another," but cites no legal authority for this proposition. (ECF No. 70, at

14

4).   Defendant's position that a claim for legal malpractice can never be made on this basis is somewhat counterintuitive. Indeed, it may be that a client has recourse against an attorney who had the means by which to affect or change the conditions under which someone is held and neglected a reasonable duty to the client, which proximately caused loss.   In his opposition to the motion to dismiss, Plaintiff contends that "[e]ven if the Court concludes that the pending [c]omplaint is defectively pled, [Plaintiff] respectfully requests the opportunity to re-plead his claims in an Amended Complaint." (ECF No. 69, at 5). Plaintiff does not specify, however, what additional allegations he plans to include in an amended complaint to state a claim for legal malpractice.   Based on the foregoing, Defendant's motion to dismiss will be granted as to the legal malpractice claim, but Plaintiff will be allowed fourteen (14) days to file a fully and adequately pled amended complaint stating a legal malpractice claim based on Defendant's conduct in connection with extradition and Plaintiff's confinement in Germany for five months.   No extensions of time will be granted considering that the initial complaint was filed on March 31, 2011, and Plaintiff waited until September 24, 2014, when he filed the opposition memorandum, to raise for the first time the confinement argument in support of the legal malpractice claim.

### B.    Legal Fees

Plaintiff seeks $54,253 in damages in connection with the first cause of action which alleges that Defendant overbilled him and charged him for work performed without an executed retainer agreement.[6]   (*See* ECF No. 1 ¶ 37).   Defendant argues that after dismissing the legal malpractice claim, the court lacks subject matter jurisdiction because standing alone, count one of the complaint does not meet the amount in controversy requirement for diversity jurisdiction.   Plaintiff appears to agree with this argument, stating that "[D]efendant's motion to dismiss [] stands or falls on whether her challenge to [] [P]laintiff's professional malpractice claim can be sustained." (ECF No. 69, at 1).

Neither party addresses the import of *Shanaghan v. Cahill*, 58 F.3d 106 (4th Cir. 1995), which applies here.   The Fourth Circuit has taken the position that in cases founded on diversity jurisdiction, such as here, if dismissal of some claims has the effect of bringing the aggregate amount in controversy below the jurisdictional amount, then the court has only supplemental jurisdiction over the remaining claim(s) and

---

[6] Curiously, the two causes of action in the complaint are not labeled, leaving the court to surmise the precise claims Plaintiff asserts.   Defendant interprets the complaint as asserting a claim for breach of contract (count I) and legal malpractice (count II).   In the opposition, Plaintiff identifies his claims as "for professional malpractice and the recovery of unearned legal fees and costs."   (ECF No. 69, at 1).

it must exercise its discretion as directed by 28 U.S.C. §
1367(c) in deciding whether to retain the remaining claim(s) or
dismiss them.  Specifically, in *Shanaghan*, 58 F.3d at 112, the
Fourth Circuit adopted a two-part test that governs the outcome
here:

> First, the court should look to the face of
> the complaint itself to determine whether it
> is a legal certainty that plaintiff's claims
> do not reach the required amount.  Unless
> the claim for an amount over the
> jurisdictional prerequisite is made in bad
> faith, or unless it is plain from the
> complaint that an amount less than the
> jurisdictional amount is all that is at
> issue, the district court has jurisdiction
> over the case.  This is akin to the "well-
> pleaded complaint" rule. . . .
>
> *Second, if some event subsequent to the
> complaint reduces the amount in controversy,
> such as the dismissal of one count* based on
> the defendant's answer, the court must then
> decide in its discretion whether to retain
> jurisdiction over the remainder of the case.

(emphasis added).  The Fourth Circuit identified five factors to
be used by the district court in the exercise of its discretion
at the second step of the analysis: (1) an evaluation of the
convenience and fairness to both parties if the case is kept or
dismissed, taking into consideration the interests of judicial
economy; (2) whether the amount claimed in the complaint was
made in good faith, or whether plaintiff was consciously relying
on flimsy grounds to file in federal court; (3) whether the
state statute of limitations would bar refiling the action in

17

state court if dismissed; (4) the amount of time and energy that the federal court already has expended in connection with the case, and whether it might be more efficient to just keep it; (5) whether the case presents some significant issue of state law best decided in state court. *Id.* at 112; *see also Peiffer v. King Pontiac Buick GMC, Inc.*, 105 F.Supp.2d 470, 472-73 (D.Md. 2000).[7]

Applying the first part of the *Shanaghan* test, it cannot be said to a legal certainty that Plaintiff's claims in the complaint fall short of the jurisdictional amount. As stated above, Plaintiff seeks $54,253 based on his claim that Ms. Wedgwood overbilled him for legal services without any retainer or contract authorizing her to perform such services. Although the complaint does not specify the total amount of damages sought for both causes of action, Plaintiff asserts that his business suffered financial loss as a result of the alleged legal malpractice and that "as a result of the [] gross incompetence on the part of [] [D]efendant, [he] has been damaged in a sum in excess of the minimum jurisdictional limits of this Court." (ECF No. 1 ¶¶ 47, 50). Plaintiff may not have had an ironclad legal malpractice claim, but it is not "plain

---

[7] Judge Grimm pointed out in *Peiffer*, 105 F.Supp.2d at 473 n.2, that the approach taken by the Fourth Circuit has been questioned by other circuits, which have declined to follow it, but the *Shanaghan* case is the law of this circuit.

from the complaint" that either claim was made in bad faith or that an amount less than $75,000 is all that is at issue. *See, e.g., Peiffer*, 105 F.Supp.2d at 473 ("Indeed, it was only after the taking of discovery that it became apparent that no claim for permanent injuries could be maintained."); *see also MHD-Rockland Inc. v. Aerospace Distributors Inc.*, Civ. No. CCB-13-2442, 2014 WL 31677, at *6 (D.Md. Jan. 3, 2014) ("The original complaint alleged damages over $75,000, and while some of the claims will be dismissed pursuant to this memorandum opinion and attached order, no party argues that these claims were made in bad faith. . . . Accordingly, the fact that [plaintiff] amended its complaint to allege damages less than $75,000 does not strip the court of subject matter jurisdiction.").

Even if dismissal of the legal malpractice claim reduces the amount in controversy to less than $75,000, the court does not automatically lose jurisdiction.  Based on the discretionary factors outlined in *Shanaghan*, Defendant's own arguments militate in favor of retaining jurisdiction.  This case originally was filed in the District of Connecticut in 2011, has "languished far too long," and may be subject to dismissal under the applicable statute of limitations if refiled in state court. (*See* ECF No. 70, at 6).  Moreover, considering the court's familiarity with the thorny procedural history of this case, retaining jurisdiction also may lead to a more efficient

resolution of the remaining issues. *See, e.g, Peiffer*, 105 F.Supp.2d at 473 ("It makes little sense to dismiss the case, only to have it filed anew in state court, where it would not likely be concluded as promptly as if it remains in this Court. The accident took place nearly four years ago.  It will not take much time to try the case, and the parties are entitled to as prompt a resolution as reasonably can be afforded.").  It does not appear that the case presents a significant issue of state law either.  The discretionary factors militate in favor of the case remaining where it is.  Accordingly, even if Plaintiff cannot state a claim as to legal malpractice, the motion to dismiss will be denied as to the first count of the complaint regarding charging of excessive fees.

## IV.  Conclusion

For the foregoing reasons, the motion to dismiss filed by Defendant will be granted in part and denied in part.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
